UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUTH TUITE, as Administrator ad Prosequendum for the Estate of Robert John Tuite, Jr., <br><br> Plaintiff, <br><br> v. <br><br> STATE OF NEW JERSEY, DIVISION OF STATE POLICE OF THE NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, JASON SOWINSKI, a New Jersey State Trooper, IAN ROSENBERG, a New Jersey State Trooper, JOSHUA COPPOLA, a New Jersey State Trooper, JOHN DOE 1-10, and JOHN DOE CORPORATION 1-10, <br><br> Defendants. | Civ. No. 10-cv-06772 (KM) <br><br> OPINION |

## MCNULTY, U.S.D.J.,

Plaintiff Ruth Tuite, as Administrator ad Prosequendum for the Estate of Robert John Tuite, Jr. ("Tuite"), commenced this Section 1983 wrongful death action against the State of New Jersey, the State Police of the New Jersey Department of Law and Public Safety ("NJSP") (collectively, "State defendants"), and New Jersey State Troopers Jason Sowinksi, Ian Rosenberg, and Joshua Coppola (collectively, the "Troopers"). The action arises from Tuite's death following his arrest by the Troopers. The complaint asserts claims under the U.S. Constitution, state statutory law, and state common law. Now before the Court are four motions for summary judgment, one filed by the State defendants and one by each of the three Troopers. For the reasons set forth below, this Court will grant the State defendants' motion and deny the motions filed by the Troopers.

1

## I. BACKGROUND

At approximately 11:01 p.m. on December 28, 2008, Trooper Sowinski observed a white sedan stopped in the middle of the northbound lane of Interstate 95. (Dkt. No. 51-4, ¶21). After positioning his patrol car behind the sedan, Trooper Sowinski approached the driver's side window and saw Tuite behind the wheel. (*Id*. at ¶24) Tuite was initially unresponsive, but Trooper Sowinksi eventually roused him and ordered him to move the sedan over to the right shoulder of the highway. (*Id*.)

Once on the shoulder, Sowinski learned that Tuite was driving with a suspended license. Sowinski radioed for assistance, and Troopers Coppola and Rosenberg soon arrived. (*Id*. at ¶¶31-33) Trooper Sowinski suspected that Tuite was intoxicated, and ordered him out of his car. (*Id*. at ¶34) Tuite failed a battery of field sobriety tests, and Sowinski advised him that he would be placed under arrest for driving while intoxicated.

Trooper Sowinski began to handcuff Tuite, and Tuite began to resist. (Dkt. No. 59-3, at 9). Sowinski managed to handcuff Tuite's right wrist, but he refused to place his arms behind his back and his left wrist remained free. Tuite struggled to break free of the three troopers, who attempted to hold him in place. (Dkt. No. 51-8) The troopers feared that both they and Tuite, who stood six feet two inches tall and weighed over two hundred fifty pounds, might stumble out of the narrow shoulder lane and into traffic. Despite repeated commands to stop resisting, Tuite continued to try to wriggle loose. Trooper Rosenberg compared Tuite to "a football player that you're trying to tackle...and the tacklers are holding onto the guy and [he's] just kinda dragging them along." (Dkt. No. 59-3, at 10)

The scuffle lasted about ninety seconds (Dkt. No. 51-4, ¶44). The troopers ultimately subdued Tuite by pushing him toward the guardrail on the right side of the shoulder lane. They pressed him forward over the railing in order to expose his arms. (Dkt. No. 52-1, ¶¶31-32) Tuite was then successfully handcuffed. Trooper Coppola noticed blood on his own hands and on Tuite's face, and the troopers called for an ambulance. (Coppola Dep., 43:9-12, 53:16-23; Dkt. No. 51-4, ¶45)

The Troopers state that, although Tuite was handcuffed, it was unsafe to try to move him to a patrol car because he was "kicking his legs and attempting to stand up" from the guardrail. (Dkt. No. 51-4, ¶49). To maintain control, Trooper Rosenberg brought Tuite to the ground and positioned him face down on his stomach. (Dkt. No. 56-1, ¶51; Rosenberg Dep., 33:5-17) Rosenberg then placed his right knee between Tuite's shoulder blades and pushed down on his shoulders with his hands. At the same time, Trooper Coppola held Tuite's legs. (Dkt. No. 56-1, ¶53; Rosenberg Dep., 34:10-18; 41:7-16)

Up to this point—*i.e.,* the point that Tuite was placed on the ground—images from a dashboard video camera in one of the patrol cars capture the events. After that, the view is blocked by Tuite's parked car. The camera did, however, continue to record audio.

After being held down on the ground for several minutes, Tuite went silent and stopped moving. That prompted the troopers to check his medical condition. (Dkt. No. 59-7, at 15; Rosenberg Dep., 42:16-25). Trooper Coppola described Tuite's behavior as abruptly transitioning from "from kicking and flailing and yelling to nothing." (Dkt. No. 59-7, at 16). Concerned that Tuite's silence might indicate that he was having trouble breathing, Troopers Rosenberg and Coppola stopped restraining him and propped him up against the guardrail. (*Id.*; Coppola Dep., 60:3-7)

In the defendants' version of events, the troopers detected a pulse. They concluded from the rising and falling of his chest that Tuite was still breathing. (Coppola Dep., 61:11-19; Dkt. 52-4, ¶43). Tuite then began drifting in and out of consciousness (Dkt. No. 51-4, ¶72), and Trooper Sowinski called to expedite the ambulance that was already on its way. Before the ambulance arrived, Trooper Coppola administered first aid by placing an oxygen mask over Tuite's mouth.

The plaintiff's version is different. The plaintiff contends that Tuite can be heard on the dashboard recording exclaiming "You guys are killing me!" (Dkt. No. 57-1, ¶63) Despite that warning, Rosenberg continued to push his knee between Tuite's shoulder blades and Coppola continued to restrain his legs. According to the plaintiff, when Tuite stopped making noise, it was because he had stopped breathing. (Dkt. 56-1, at 12-13). According to the plaintiff, Coppola then let approximately ten minutes go by before applying an oxygen mask. (Dkt. 57-1, ¶119)

The ambulance arrived. The EMTs determined that Tuite was not breathing and that there was a "bluish tinge to the area around his lips." (Idler Dep., 17:4-18) Tuite went into cardiac arrest on the way to Englewood Hospital and was pronounced dead on arrival at 12:31 a.m. (*Id.* at 19:12-16; 21:5-22; Dkt. No. 51-9, at 14)

The autopsy report gave the cause of death as "cardiorespiratory arrest following physical restraint and struggle" while under the influence of alcohol and a prescription muscle relaxer. As contributory causes the report lists "asthma," "stenosis of larynx," and "obesity." The plaintiff maintains that the manner in which the troopers held Tuite to the ground caused him to die of positional asphyxiation, a form of suffocation that occurs when a person's position prevents him from breathing. According to the plaintiff, the troopers deliberately withheld from the EMTs the information that Tuite had been held face down with a knee to his back. That omitted information would have been

3

relevant to Tuite's treatment, and it also distorted the conclusions of the autopsy report. (Dkt. No. 57-1, ¶¶183-87)

## II. JURISDICTION

This Court has jurisdiction over the plaintiff's federal-law claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331. It has supplemental jurisdiction over the plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

## III. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. In all cases, the ultimate question is "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Anderson*, 477 U.S. at 254.

## IV. ANALYSIS

### A. Claims Against the State Defendants

Tuite's claims against the State of New Jersey and the NJSP are barred by the Eleventh Amendment and by case law interpreting the term "person" as used in 42 U.S.C. §1983.

The sovereign immunity conferred by the Eleventh Amendment shields states and their agencies from suits brought in federal court. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). That jurisdictional bar applies regardless of the particular relief requested. *Id.* at 100-01.

Claims under 42 U.S.C. § 1983 are barred by the Eleventh Amendment. Although Congress may in some circumstances override a state's sovereign immunity, it did not do so when it enacted Section 1983. *Quern v. Jordan*, 440 U.S. 332, 342 (1979). State-law claims, too, are barred by the Eleventh Amendment. Even where state-law claims would properly be brought to federal court,[1] the Eleventh Amendment denies the court jurisdiction to hear claims that a state or its agencies violated state law. *See Penhurst State School & Hosp.*, 465 U.S. at 121.

Finally, there is a closely related bar to relief under 42 U.S.C. § 1983. The State of New Jersey and the NJSP are not "persons" who may be liable under that statute. Section 1983 provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983 (emphasis added). It is well established that states and their agencies fall outside the definition of a "person" as that term is used in Section 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that neither a State nor its officials acting in their official capacities are "persons" under § 1983); *Smith v. New Jersey*, 2012 WL 5465023, at *1 (D.N.J. Nov. 7, 2012) (holding that New Jersey and the NJSP are not suable "persons").

For all of these reasons, the State defendants are entitled to summary judgment on all of Tuite's claims.

### B. Claims Against the Individual Trooper Defendants

#### 1.    §1983 Claims Against the Troopers

Section 1983 is a statutory vehicle to redress violations of federal law. A Section 1983 plaintiff must show that a person acting under color of state law

---

[1] *See* 28 U.S.C. § 1367 (supplemental jurisdiction). Based on the dismissal of all federal-law claims against the State defendants, I would dismiss the state-law claims on the alternative ground that supplemental jurisdiction is inappropriate.

5

deprived the plaintiff of a federal constitutional or statutory right. *See Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995).

The plaintiff claims here that the Troopers violated Tuite's Fourth and Fourteenth Amendment rights by using excessive force and failing to provide adequate medical care, resulting in his death. The Troopers claim qualified immunity because, as a matter of law, the force used to restrain Tuite was objectively reasonable and the defendants were sufficiently attentive to Tuite's medical needs.

### a. Qualified Immunity

The doctrine of qualified immunity balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court articulated a two-step test for determining whether a government official is entitled to qualified immunity. First, the court must ask whether "the officer's conduct violated a constitutional right." *Id.* at 201. Second, the court must ask whether the right at issue was so well established that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. Both are required. District courts may consider these questions in the order that will best facilitate the disposition of the case. *Pearson*, 555 U.S. at 242

### b. Excessive Force

A claim that the police used excessive force in the course of an arrest must be analyzed under the Fourth Amendment standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 395 (1989). That "reasonableness" determination requires a court to balance several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Sharrar v. Felsing*, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing *Graham*, 490 U.S. at 396). "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Id.*

Qualified immunity on an excessive force claim presents an objective question that may often be decided by the court as a matter of law. *See Curley*

6

*v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007) ("Whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court[.]"). However, where historical facts relevant to the objective reasonableness determination remain in dispute, the court will not be able to resolve the issue on summary judgment. Instead, a jury will need to resolve such factual disputes, usually through special interrogatories if necessary. *See id.* ("[A] jury can evaluate objective reasonableness when relevant factual issues are in dispute.") (citing *Sharrar*, 128 F.3d at 830-31).

Here, Mr. Tuite cannot testify on his own behalf. In such a case, I am particularly cognizant of my duty to "examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Tofano v. Reidel*, 61 F.Supp.2d 289, 301 (D.N.J. 1999) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

After reviewing the evidence, I conclude that there are disputed material facts relevant to the issue of whether the use of force was objectively reasonable. Most significantly, it is unclear for how long Tuite resisted and what level of force was reasonably necessary. In that connection, I note that the use of force, even if initially justified, may become excessive as events unfold. *See Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.").

It may be true that the troopers had to use force to handcuff Tuite. It may even be true that some continuing application of force was required. Even so, the court must consider whether, once Tuite was handcuffed, the *degree* of force used to restrain him exceeded what was reasonably warranted.

The Troopers maintain that Tuite, even handcuffed and prone, continued to resist.[2] The degree of resistance may bear on whether it was reasonable to plant a knee in his back and hold him down. *See Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 124 (3d Cir. 2007) ("Although officers—indeed, any reasonable person—should [know] that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable, it is not so clearly unreasonable to exert severe force on an individual who continues to violently resist arrest."). On that point, plaintiff claims that there is evidence that Tuite told the officers that he

---

[2] There is no contemporaneous visual evidence from anyone other than the troopers. Once Tuite was on the ground, the events were out of frame of the dashboard video. The tow truck operator on the scene states that he does not recall what happened once Tuite was brought down. (Brydson Dep., 71:9-72:15).

7

was in distress. On the audio portion of the dashboard recording, says plaintiff, Tuite can be heard to exclaim "You guys are killing me!" (The defendants disagree that this can be heard.)

Construing the record in the light most favorable to the plaintiff, I cannot conclude as a matter of law that holding him down in this manner was a reasonable use of force. It may be that Tuite continued to resist to some degree, but it is also true that he was prone and handcuffed. It may be that the officers were justified in applying some force, but it may also be true that Tuite was in distress and that the officers should have realized that. An assessment of the danger posed by the defendant, based on, *e.g.*, his physical size and the proximity of traffic, may require the exercise of a fact finder's judgment. The restraint went on for some time, Tuite was unarmed, and the officers had no other suspects to deal with. *See generally Sharrar, supra* (relevant factors).

Whether the application of force was reasonable, then, depends on a sensitive weighing of all the circumstances—the kind of weighing that only a fact finder can perform. Because Mr. Tuite is deceased, the fact finder may have to consider circumstantial and medical evidence in assessing the troopers' testimony. In short, it is far from certain that a reasonable jury would find excessive force, but it could. *See, e.g., Estate of Awkward v. Willingboro Police Dept.*, 2010 WL 3906785, at *11 (D.N.J. Sept. 30, 2010) ("[I]f [the decedent] had been successfully handcuffed and the officers still remained on his back while he pushed-up and yelled that he could not breathe, it would be clear that the officers acted unreasonably.").

Accordingly, in light of the disputed historical facts material to the qualified immunity question, I cannot grant summary judgment as a matter of law. The Troopers' summary judgment motion is denied as to the excessive force claim.

### c. Failure to Provide Adequate Medical Care

Failure to provide medical care to a person in "custody" can rise to the level of a constitutional violation if that failure amounts to "deliberate indifference to that person's serious medical needs." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).[3] A "serious medical need" is "one

---

[3]   In general, the Fourth Amendment "reasonableness" standard governs arrest and seizure, while the Eighth Amendment "deliberate indifference" standard governs claims arising from punitive imprisonment. In *Groman*, the Third Circuit applied the Eighth Amendment "deliberate indifference" standard to the claims of an arrestee in police "custody." Subsequent cases have applied the same standard to medical claims arising at various points on the custodial continuum. *See Pierce v. Cherry Hill Tp.*, 2013 WL 3283952 at n.8 (D.N.J. June 26, 2013) (collecting cases). The "deliberate indifference" standard, at any rate, sets a minimum standard of care that must be afforded to arrestees. Courts have therefore applied established deliberate-indifference

that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Atkinson v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal citations omitted). Deliberate indifference may be inferred where, for example, defendants had knowledge of the need for medical care and intentionally refused to provide it, or intentionally "opt[ed] for an easier and less efficacious treatment." *Monmouth Co. Correctional Institutional Inmates v. Lanzaro*, 834 F.2d at 346–47 (internal citations and quotations omitted). Where there is a factual dispute material to the issue of deliberate indifference, a court cannot grant summary judgment on the basis of qualified immunity. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n. 15 (3d Cir. 2001) ("Because there is a genuine issue of fact as to whether [defendant] was deliberately indifferent, she has not carried her burden to establish that she is entitled to such immunity.")

   The parties do not dispute that Tuite's condition evidenced a "serious medical need." They disagree on whether the Troopers' conduct amounted to deliberate indifference.

  The plaintiff argues that the Troopers should have been aware that Tuite was inert and had ceased breathing. (Dkt. No. 56, at 14; Dkt. No. 56-1, ¶119) Yet ten minutes passed before they attempted to provide first aid, and the aid they did provide was inadequate (Dkt. No. 56-1, ¶¶120-23, 129; (Dkt. No. 56, at 14). Belatedly placing an oxygen mask over Tuite's face, says plaintiff, was ineffectual because he was no longer drawing air into his lungs. (Dkt. No. 56-1, ¶¶122-23) CPR would have been required.

  The plaintiff also contends that the Troopers deliberately withheld from the EMTs certain information—specifically, that Trooper Rosenberg had knelt on Tuite's back. That omitted information allegedly would have been relevant to the medical decisions that were made about Tuite's care. (Dkt. No. 57, at 12).

  The Troopers respond that, while Tuite was undoubtedly having medical issues, he did not stop breathing and was able to respond when addressed by name. (Dkt. No. 51-4, ¶¶ 81, 84, 85, 87). By providing basic medical care and

---

standards to Section 1983 medical care claims arising in the course of an arrest. *See Walmsley v. City of Philadelphia*, 872, F.2d 546, 552-53 (3d Cir. 1989) (reversing a directed verdict and concluding that a jury could reasonably infer that certain officers were deliberately indifferent to plaintiff-arrestee's medical needs); *Hill v. Algor*, 85 F.Supp.2d 391, 409 (D.N.J. 2000) ("*Groman and Walmsley* [] provide that the deliberate indifference standard governs [] claims arising out of one's arrest and post-arrest detention."). I will therefore make the defendant-favorable assumption that the deliberate indifference standard applies.

9

requesting an ambulance, they say, they discharged their constitutionally required duty of care.

Based on the troopers' testimony, the circumstantial evidence, and the medical evidence, a jury will have to decide whether Tuite stopped breathing while Rosenberg and Coppola held him down; whether the circumstances should have alerted the troopers to Tuite's distress; whether they should have realized that CPR was necessary; and whether they compromised Tuite's medical care by withholding pertinent information from the EMTs. In light of those factual issues, the Troopers' motions for summary judgment are denied as to the medical claim.

### 2. State Law Claims

The Troopers do not press any independent arguments as to Tuite's state-law claims. Since I am denying the Troopers' summary judgment motions as to the federal Section 1983 claims, I will retain supplemental jurisdiction over the related state law claims. *See* 28 U.S.C. § 1367.

## V. CONCLUSION

For the reasons stated above, the State defendants' motion for summary judgment is **GRANTED**, and the Troopers' motions for summary judgment are **DENIED**.

An appropriate Order will issue.

Dated: October 8, 2014

*/s/ Kevin McNulty*
**KEVIN MCNULTY**
**United States District Judge**